UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LARRY BROWN, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|   vs. | )   Case No. 4:11CV1527 JCH |
| | ) |
| CRST MALONE, INC., | ) |
| | ) |
|     Defendant/Third-Party Plaintiff, | ) |
| | ) |
|   vs. | ) |
| | ) |
| AMS STAFF LEASING, N.A. LTD., | ) |
| | ) |
|     Third-Party Defendant. | ) |

## **MEMORANDUM AND ORDER**

This matter is before the Court on Third-Party Defendant AMS Staff Leasing, N.A. Ltd.'s Motion to Dismiss Pursuant to FRCP 12(b)(6), filed on April 19, 2012. ("Motion to Dismiss," ECF No. 25). This matter is fully briefed and ready for disposition.

## **BACKGROUND**

Plaintiff Larry Brown ("Plaintiff" or "Brown") was employed by Defendant CRST Malone, Inc. ("Defendant" or "CRST") from July 1998 through October 2007 as the owner/operator of a truck that he operated on behalf of CRST. (Complaint, ECF No. 4, ¶ 3). CRST required Brown to purchase "bobtail," "deadhead," and "workers' compensation" insurance that would apply to Brown while he worked as an owner/operator for CRST. (Id., ¶ 4). CRST agreed to assist Brown and other owner/operators working for CRST to purchase this insurance, and CRST agreed to deduct monthly premiums from Brown's paychecks and remit the monthly premiums to a workers' compensation insurance carrier or the agent that CRST selected to obtain or provide such insurance. (Id., ¶ 5).

On July 21, 2002, Brown was injured while unloading freight at the Dow Chemical Company plant in Pevely, Missouri. (Id., ¶ 7). Brown filed a workers' compensation claim for injuries to his right lower extremity, right knee, body as a whole, left knee, right upper extremity, right hand, left eye, and back. (Id.). Brown received workers' compensation benefits for medical care and temporary disability from July 21, 2002, until March 2004, when Brown's benefits unexpectedly ceased. (Id., ¶ 8). At a hearing on Brown's workers' compensation benefits before Missouri Administrative Law Judge Leslie Brown on May 19, 2008, Brown learned that the workers' compensation policy for which premiums had been withheld from his paycheck had allegedly been cancelled by the workers' compensation carrier, CNA, around May 30, 2002. (Id.). Therefore, Brown was not insured under the Missouri Workers' Compensation Law at the time of his accident. (Id.). On July 31, 2008, Judge Leslie Brown ruled that Brown was not insured under the Missouri Workers' Compensation Law at the time of his accident but was rather a self-employed owner/operator ("ALJ decision"). (Id., ¶ 9).

Brown brought this action against CRST for the negligent procurement of insurance on March 17, 2011, in the Circuit Court of Jefferson County, State of Missouri. (Notice of Removal, ECF No. 1, ¶ 1). CRST removed this action to this Court on September 1, 2011, on the basis of diversity jurisdiction under 28 U.S.C. § 1332(a) and 28 U.S.C. § 1441. CRST filed a Third-Party Complaint for Indemnity Against Third-Party Defendant AMS Staff Leasing, N.A., Ltd. ("Third-Party Defendant" or "AMS") on January 13, 2012. ("Third-Party Complaint," ECF No. 13).

According to the allegations in the Third-Party Complaint, AMS enters into service contracts with client companies to provide assistance with the preparation of payroll, tax withholding, and workers' compensation coverage. (Id., ¶ 7). One of AMS's client companies was the Association of Contract Truckmen, Inc. ("ACT"). (Id., ¶ 6). ACT was formed to obtain workers' compensation

insurance for its members, who are independent truck drivers. (Id.). On December 1, 2001, ACT entered into a Staff Leasing Agreement with AMS to provide ACT with certain services, including workers' compensation insurance for ACT members. (Id., ¶ 8). The Staff Leasing Agreement required ACT to "lease" its owner/operators to AMS, making ACT's members "co-employees" of AMS. (Id.). AMS was then obligated to obtain worker's compensation insurance for these "co-employees." (Id.).

On May 1, 2002, Brown entered into an agreement with ACT to purchase workers' compensation insurance on his behalf. (Id., ¶ 9). Pursuant to this agreement, Brown authorized CRST to deduct his monthly insurance premiums and to remit the amounts deducted to ACT on his behalf. (Id.). ACT would forward the amounts received from its members to AMS along with a list reflecting the owner/operators to be covered by these payments. (Id., ¶ 10). AMS would then forward the information regarding the owner/operators and their premium payments to the workers' compensation carrier. (Id.).

According to the allegations in the Third-Party Complaint, from 2001 and 2002, AMS's workers' compensation carrier was National Fire Insurance Company of Hartford, also known as NFIC of Hartford or CNA Financial Corporation ("CNA"). (Id., ¶ 11). CNA cancelled its insurance policy with AMS in 2002, with the cancellation effective as of June 20, 2002. (Id.). AMS advised ACT that the CNA policy had been cancelled and that it would have to cancel its Staff Leasing Agreement with ACT, but neither AMS nor ACT notified CRST of the coverage cancellation. (Id., ¶ 12).

As indicated above, CRST brought a Third-Party Complaint against AMS on January 13, 2012. The Third-Party Complaint contains a single count for "common law/implied indemnification" and alleges AMS breached its obligations to Brown in the following ways:

> a) by failing to obtain workers' compensation insurance for Mr. Brown in breach of its agreement with ACT; b) by failing to transmit Mr. Brown's withholdings to CNA; c) by failing to inform Mr. Brown or CRST of the cancellation of his workers' compensation insurance coverage; and d) by otherwise breaching its contractual and/or common law obligations to Mr. Brown.

(Third-Party Complaint, ¶22). Accordingly, CRST claims AMS is obligated to indemnify CRST for any damages assessed against it arising out of the procurement of workers' compensation insurance that AMS undertook on behalf of Brown.

AMS filed its Motion to Dismiss on April 19, 2012, on the following grounds: 1) CRST has failed to satisfy the elements of implied equitable indemnification because CRST has not shown AMS owed a duty to Brown that was "identical" to the one owed to Brown by CRST; 2) CRST is barred from arguing that Brown was a co-employee of AMS and ACT by the plain language of the staff leasing agreement between AMS and ACT; 3) CRST is collaterally estopped from arguing that Brown was a co-employee of AMS and ACT by *AMS Staff Leasing v. Associated Contract Truckmen, Inc.*, No. 304CV1344D, 2005 WL 3148284 (N.D. Tex. Nov. 21, 2005) ("the Texas Case"); and 4) CRST is collaterally estopped from arguing that Brown was a co-employee of AMS and ACT by the ALJ decision.

## **STANDARD**

In ruling on a motion to dismiss, the Court must view the allegations in the Complaint in the light most favorable to Plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). A cause of action should not be dismissed for failure to state a claim unless, from the face of the Complaint, it appears beyond a reasonable doubt that Plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Jackson Sawmill Co., Inc. v. United States, 580 F.2d 302, 306 (8th Cir. 1978), cert. denied, 439 U.S. 1070 (1979).

Dismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity. Stringer v. St. James R-1 Sch. Dist., 446 F.3d 799, 802 (8th Cir. 2006). As a practical matter, such dismissal should be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint there is some insuperable bar to relief. Schmedding v. Tnemec Co., Inc., 187 F.3d 862, 864 (8th Cir. 1999); see also 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. § 1357, at 565 (3d ed. 2004) (stating that "relatively few complaints fail to meet this liberal standard and thereby become subject to dismissal" under Rule 12(b)(6)).

## DISCUSSION

### I. Implied Indemnification

AMS argues CRST has not established a claim for implied indemnification under Missouri law because CRST has not shown AMS had an obligation to Brown that was identical to the obligation CRST had to Brown. The Court finds CRST has adequately alleged a claim for implied indemnification under Missouri law.

Indemnity is the shifting of responsibility from the shoulders of one person to another. SSM Health Care St. Louis v. Radiologic Imaging Consultant, LLP, 128 S.W.3d 534, 539 (Mo. Ct. App. 2003) (citing Safeway Stores, Inc. v. City of Raytown, 633 S.W.2d 727, 727 n.3 (Mo. 1982)). Indemnity is a right that inures to the person who has discharged a duty that is owed by him, but which, as between himself and another, should have been discharged by the other, so that if the other does not reimburse the person, the other is unjustly enriched to extent that his liability has been discharged. Id. (citing Koeller By and Through Koeller v. Unival, Inc., 906 S.W.2d 744, 746 (Mo. Ct. App. 1995)). This right of indemnity is based on the principle that everyone is responsible for the

consequences of his own wrongdoing, and if another person has been compelled to pay the damages which ought to have been paid by the wrongdoer, that person may be recovered from him. Id. (citing 42 C.J.S. *Indemnity* § 3; 41 AM. JUR. 2D *Indemnity* § 2).

Missouri recognizes both contractual indemnity, in which parties agree that one party will protect the other party against liability or loss, and non-contractual indemnity. Beeler v. Martin, 306 S.W.3d 108, 110-11 (Mo. Ct. App. 2010). To establish a claim for non-contractual indemnity, which is also referred to as common law indemnity or equitable indemnity, the plaintiff must show: (1) "the discharge of an obligation by the plaintiff"; (2) "the obligation discharged by the plaintiff is identical to an obligation owed by the defendant"; and (3) "the discharge of the obligation by the plaintiff is under such circumstances that the obligation should have been discharged by the defendant, and the defendant will be unjustly enriched if the defendant does not reimburse the plaintiff to the extent that the defendant's liability has been discharged." Id. (citing State ex rel. Manchester Ins. & Indemn. Co. v. Moss, 522 S.W.2d 772 (Mo. 1975)).

Here, viewing the allegations in the light most favorable to Third-Party Plaintiff CRST, the Third-Party Complaint adequately alleges a claim for implied indemnification against AMS. In his Complaint, Brown alleges that CRST

> agreed that it would assist Plaintiff...to purchase said insurance; and further agreed that it would procure a policy of workers' compensation insurance for Plaintiff...; would collect and deduct from Plaintiff's...pay the monthly premiums for said insurance; and would remit the monthly premium it withheld from said owner/operators' payments to the workers' compensation insurance carrier or to the agent [CRST] had selected to obtain and/or provide said insurance.

(Complaint, ¶ 5). The Third-Party Complaint alleges Brown entered into an agreement with ACT to purchase workers' compensation insurance on his behalf. The Third-Party Complaint also alleges ACT contracted with AMS to provide workers' compensation insurance for ACT members, including Brown. Thus, CRST asserts that, if CRST is found to have had a duty to purchase workers'

compensation insurance on behalf of Brown and if a judgment is entered against CRST for the breach of that duty, AMS had an identical duty to provide workers' compensation insurance to Brown so as to make it unjust for AMS not to reimburse CRST if CRST is compelled to pay Brown.

The plain language of the Staff Leasing Agreements[1] between AMS and ACT does not compel a different conclusion. The Staff Leasing Agreements state that they are "providing the services to assigned co-employees ("Workers"), described in this Agreement at the request of" ACT. (Staff Leasing Agreements, ECF No. 26-1, ¶ 1). The Staff Leasing Agreements state that AMS agrees to provide "continual maintenance of the workers' compensation insurance with respect to all of the Workers and in connection therewith, provision to [ACT] of certificates evidencing such insurance coverage." (Id., ¶ 2(e)). Finally, the Staff Leasing Agreements state "AMS Staff Leasing agrees to obtain and provide Workers' Compensation and Employers Liability Insurance, including Occupational Disease Coverage, providing statutory benefits for Employers Liability Insurance." (Id., ¶ 8). AMS makes much of the fact that the Staff Leasing Agreements allegedly "assign co-employees" of AMS and ACT to ACT instead of assigning such "co-employees" to AMS, as the Third-Party Complaint asserts. Even assuming AMS's interpretation of the Staff Leasing Agreements is correct, this is a distinction without a difference: regardless of who is leasing "co-employees" to whom, the terms of the Staff Leasing Agreements indicate AMS is obligated to provide workers' compensation insurance coverage to the "co-employees."

---

[1]According to the documents filed by AMS in support of its Motion to Dismiss, AMS and ACT entered into two separate Staff Leasing Agreement: the first Agreement took effect on December 1, 2000, and continued for a period of twelve months, while the second Agreement took effect on December 1, 2001, and also continued for a period of twelve months. (See Staff Leasing Agreements, ECF No. 26-1.) The Agreements are not identical, but the provisions discussed in this Memorandum are the same in both Agreements.

AMS also argues the Staff Leasing Agreements show Brown was not one of the "co-employees" covered by the Agreements because AMS did not administer Brown's payroll or deduct his insurance premiums from his paycheck. As noted by CRST, the Staff Leasing Agreements do not require AMS to perform all payroll services but merely state AMS will provide "consulting assistance" with regards to various payroll functions. Furthermore, AMS's argument assumes the Staff Leasing Agreements are the only operative agreements between AMS and ACT during the relevant time period. Since the meaning of "consulting assistance" and the exclusivity of the Staff Leasing Agreements are not settled issues at this stage in the litigation, the text of the Staff Leasing Agreements does not negate any of CRST's substantive allegations at this time.

## II. Issue Preclusion

AMS also argues CRST is collaterally estopped from arguing that Brown was a "co-employee" under the Staff Leasing Agreements by the Texas Case and the ALJ Decision. The Court finds both of these arguments unpersuasive.

The application of collateral estoppel in diversity cases is determined according to state law. Nanninga v. Three Rivers Elec. Co-op., 236 F.3d 902, 906 (8th Cir. 2000). In deciding whether the application of collateral estoppel is proper, a court considers the following four factors:

> (1) whether the issue in the present case is identical to the issue decided in the prior adjudication; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom collateral estoppel is asserted was a party, or was in privity with a party, to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior adjudication.

Wilkes v. St. Paul Fire and Marine Ins. Co., 92 S.W.3d 116, 120 (Mo. Ct. App. 2002).

First, the issue in the present case is not identical to the issues decided in the Texas Case. The Texas Case was brought by AMS against ACT and Dave Brandert, ACT's president, for breach of contract, fraud, and fraudulent inducement. See AMS Staff Leasing, 2005 WL 3148284, at *1. ACT

and Brandert counterclaimed for breach of contract and fraud and brought a third-party action against Pacesetter Adjustment Company for negligence, contribution, and indemnity. Id. The court in the Texas Case granted summary judgment in favor of AMS on its breach of contract claim against ACT, finding that ACT breached its contract with AMS by issuing Certificates of Insurance that falsely represented that ACT was the named insured on the CNA policy. Id. at *7. This conclusion was based solely on ACT's failure to respond to numerous Requests for Admissions, which the court deemed admitted, and ACT's failure to respond to AMS's motion for summary judgment. See id. The court in the Texas Case denied summary judgment on AMS's claims against ACT and Brandert for fraud, fraudulent inducement, and negligent misrepresentation. Id. at *8.

The issue in this case is whether AMS agreed to procure workers' compensation insurance for Brown. The Texas Case makes no mention of Brown or any other specific truck drivers. Nonetheless, AMS seems to argue that all of the court's findings in the Texas Case apply to the present litigation, "particularly as to whether AMS contracted with ACT to provide worker's compensation insurance to truckers such as Brown." (Third-Party Defendant's Memorandum of Law in Support of its Motion to Dismiss Pursuant to FRCP 12(b)(6), ECF No. 26, p. 18). AMS does not specify what category of "truckers" constitute "truckers such as Brown." The Court assumes "truckers such as Brown" refers to other owner/operators (i.e., independent contractors) employed by CRST. The language of the Texas Case suggests, however, directly contradicts AMS's assertion that the Texas Case found AMS did not contract with ACT to provide workers' compensation insurance to owner/operators. The court in the Texas Case noted as follows: "In December 2000 AMS and ACT entered into a staff leasing agreement, which was renewed in December 2001, under which, *inter alia*, ACT's **independent truckers** obtained workers' compensation coverage through AMS." Id. at *1 (emphasis added). Thus, even if the Court were to find that the question in this case

as to AMS's obligation to provide workers' compensation insurance to Brown is identical to the question of whether AMS contracted with ACT to provide worker's compensation insurance as determined by the court in the Texas Case, the language of the Texas Case weighs strongly against AMS. The Court finds that the Texas Case has no preclusive effect on the present lawsuit.

Second, the issue in the present case is not identical to the issues decided in the ALJ Decision. AMS argues the ALJ Decision found no employer/employee relationship between AMS and Brown, and that such finding forecloses CRST from arguing Brown was a "co-employee" under the Staff Leasing Agreements. As noted by CRST, however, the ALJ Decision did not attempt to interpret the definition of "co-employee" under the Staff Leasing Agreements but merely applied the definition of "employee" under the Missouri Workers' Compensation Act ("Act"). Thus, the ALJ Decision and the Staff Leasing Agreements concern entirely different definitions of "employee." A claim for workers' compensation benefits is governed solely by the definition of "employee" contained in the Act. See Shelton v. City of Springfield, 130 S.W.3d 30, 35 (Mo. Ct. App. 2004). "Consequently, whether an employee is entitled to workers' compensation benefits is not a contractual issue, but a statutory one." Id. The Staff Leasing Agreements contain no definition of the term "co-employee." In the absence of a provision in the Staff Leasing Agreements providing that the definition of "co-employee" under the Agreements is coextensive with the definition of "employee" under the Act, there is no basis for equating "co-employee" under the Staff Leasing Agreements with "employee" under the Act. Therefore, the Court finds that the ALJ decision has no preclusive effect on the present lawsuit.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Third-Party Defendant AMS Staff Leasing, N.A. Ltd.'s Motion to Dismiss Pursuant to FRCP 12(b)(6) (ECF No. 25) is **DENIED**.

Dated this <u>6th</u> day of July, 2012.

/s/Jean C. Hamilton
UNITED STATES DISTRICT JUDGE